**MAYFLOWER INVESTMENT COMPANY
et al., Appellants,**

v.

**Russell S. STEPHENS, Appellee.**

No. 15746.

Court of Civil Appeals of Texas.

Dallas.

Dec. 30, 1960.

Rehearing Denied March 24, 1961.

C. C. Renfro and H. B. Houston, Dallas, for appellants.

J. Edwin Fleming, Dallas, and James W. Rainey, Jr., Irving, for appellee.

THOMAS, Justice.

Appellee Russell S. Stephens, as plaintiff below, brought suit against Mayflower Investment Company, a corporation, and its President and Vice-President, in damages for trespasses and other wrongs affecting appellee's land. Appellee alleged that Mayflower was the owner of the adjoining land to the East, and in the process of improving its tract as a residential addition to the City of Irving, the corporation and its officers constructed a drainage ditch to divert the waters from a natural creek which meandered through Mayflower's land, and in doing so failed to observe the common boundary line, but broke appellee's close (that visible or invisible fence by which the common law deems every man's land to be inclosed) along the entire length of appellee's East boundary line without his consent. Based upon a jury's answers to special issues submitted, judgment was rendered for appellee against the corporation and the individual defendants, jointly and severally, for $10,000 with $4,350 accrued interest, as actual damages, and for $12,750 against the corporation as exemplary damages. The judgment for actual damages with accrued interest is proper, but there is no evidence to sustain the judgment for exemplary damages.

Appellee owns a rectangular tract of about 8 acres upon which he and his family live. His South line fronts 328.7 feet on Kit Lone Star Road; his East boundary line of 988.9 feet in length coincides to that dis-

tance with Mayflower's West boundary line. Mayflower owned a forty-acre tract lying immediately East of appellee's tract, which also fronts on the North side of Kit Lone Star Road.

The forty-acre tract, in its natural state, had a large creek situated upon it which entered the forty-acre tract North of appellee's property; a bight in the creek turned Westward, then Southerly and crossed appellee's North line; then it circled Eastward across the Northeast portion of appellee's tract, re-entered the Mayflower tract, and meandered in a Southeasterly direction to about the center of the forty-acre tract; thence the creek turned Southwesterly to the Southeast corner of appellee's property, whence it turned Eastward again.

A branch of the large creek flowed across appellee's property in its natural state, entering near his Northwest corner. The branch meandered across appellee's land and emptied into the large creek near the Southeast corner of appellee's land. This small branch or creek furnished natural drainage to appellee's tract as well as to some of the land lying to the North and West thereof.

In order to obtain the maximum return from the subdivision of its property for residential purposes, Mayflower decided to completely eliminate the old creek by filling its channel and diverting the drainage flow of the old creek. To accomplish that result a large drainage ditch was cut running almost the entire length of the common boundary between appellee's and appellants' tracts. The bight in the creek which circled across the Northeast portion of appellee's land was by-passed. The bottom of the ditch, as built, was from 5 to 13 feet in width; its depth varied from 6 to 12 feet. The Eastern bank on the Mayflower side was constructed with a slope, but the Western side next to appellee's land was practically a vertical cut without any artificial support. The old creek bed was approximately 400 feet East of appellee's residence, whereas the ditch is only 83 to 84 feet from

his residence. The new ditch near the South end of the two tracts turned almost 90 degrees Eastward. Along the Western side of the ditch near the South end and around the curve made by the turn, a concrete apron and retaining wall was constructed to turn the flow of water and prevent washing.

Mayflower employed Mr. Lynn Brown, a licensed surveyor and engineer, a life-long resident of Irving, and at the time of trial Mayor of that City, to plan and direct the improvement of its property as additions to the City of Irving. Incident to this employment Mr. Brown planned the required changes in drainage and grading and designed and located the ditch in controversy for the independent contractor which did the actual construction work. Mr. Brown supervised the construction of the ditch until the excavation was completed. The old creek bed was filled and the area cleared and leveled. A street was run from Kit Lone Star Road Northward through the middle of the area where the old creek had been, and it was subdivided into blocks A and B of Mayflower Addition No. 3, and into 32 lots. Across the rear of each lot, abutting the common boundary, a 30-foot utility and drainage easement purporting to include the ditch, was reserved. Mayflower built residences on each lot and at the time of the trial all of the lots had been sold to persons who were not parties to this suit.

In answer to some 29 special issues the jury found: that Mayflower committed one or more trespasses, as that term was properly defined, on appellee's land which resulted in damages; that in digging the ditch, lateral support, as that term was properly defined was withdrawn from the Eastern side of appellee's property; that a part of appellee's land has sloughed off or caved into the drainage ditch; that Mayflower caused large quantities of dirt to be dumped into the old creek bed on appellee's property without his consent; that it diverted or caused to be diverted the ordinary flow of water of the old creek

which came upon appellee's land which resulted in damages thereto; that it caused a levee or dam to be constructed on appellee's property along the Western bank of the drainage ditch without his consent; that a part of a concrete apron near the South end of the drainage ditch is upon appellee's land erected without his consent; that Mayflower "stopped up" or caused to be stopped up the natural outlet of a small creek or branch which emptied into the large creek near the Southeast corner of appellee's land without his consent; that the reasonable cash market value of appellee's property immediately before the digging of the ditch was $25,000 and such value after the completion of the drainage ditch was $15,000; that the acts and conduct of Mayflower in the location and construction of the drainage ditch were wilful or malicious and done without regard to the consequences they would have upon appellee's land; that appellee is entitled to exemplary damages, as properly defined, against Mayflower in the sum of $12,750; that the President and Vice-President of Mayflower knew that the drainage ditch in question was to be dug at or near the location where it is situated, and consented to the digging thereof at the location, approved the location and size of the drainage ditch and knew or should have known the effect such excavation for the ditch would have upon appellee's land; that when appellee first contacted the Vice-President of Mayflower he did not know the correct location of his East boundary line and by his acts and conduct did not cause Mayflower to believe appellee had no objection to the construction of the ditch, the filling in of the old ditch, or creek, and the improvements.

Although appellants urge 21 points of appeal, the points fall into five main contentions regarding: (1) the refusal of the court to submit any issues as to the disputed location of the boundary line on the ground; (2) the manner in which the court submitted the causation and damage issues; (3) the submission of the exemplary damages issues; (4) the submission of issues regarding individual responsibility of the officers of Mayflower; and (5) the adding of interest in the judgment to the actual damages.

### The Disputed Boundary.

Appellants' first point of appeal is that the Court erred in failing and refusing to submit any issue as to the disputed location of the boundary line on the ground. Appellants requested two special issues asking the jury for findings regarding alternative bounday lines, either of which appellants consider favorable. Appellants contend that the location of the boundary line is a controlling issue, whereas, appellee contends by his two counterpoints (1) that the common boundary line was not an ultimate issue but only a phase thereof, and (2) that the common boundary line was established as a matter of law and there is no basis in the evidence for the requested issues.

The court should submit only the controlling issues as distinguished from the evidentiary ones. "A controlling special issue * * * may be described, then, as a question which inquires as to the truth of a single material proposition of fact which constitutes a component element of a ground of recovery or of defense * * *. No special issue submits a controlling issue if, when answered, it can have no effect upon the judgment." McDonald, "Texas Civil Practice," Vol. 3, § 12.06. "The problem of controlling as opposed to evidentiary special issues should rest largely within the discretion of the trial court, to be disturbed upon appellate review only in cases of probable harm." 25 Tex.L.Rev. 391, 406. The late Professor Masterson in 6 S.W. Law Journal, 165-166 makes the following statement: "By an ultimate (controlling) issue is meant an issue which, standing alone, could constitute an essential part of plain-

tiff's cause of action or of an affirmative defense * * *."

In an effort to support their contention appellants cite three decisions, to wit: (1) Kirby Lumber Co. v. Stewart, Tex. Civ.App., 141 S.W. 295, no writ history, is a damage suit *tried on a general charge,* improperly placing the burden on defendant to prove it cut timber from land described in its timber deed because the burden remained on plaintiff throughout the case to prove he owned the land in question as well as the timber thereon, and that defendant cut timber from plaintiff's land. Only the burden of proof is involved in that case. (2) Southern Pine Lumber Co. v. Whiteman, Tex.Civ.App., 104 S.W.2d 635, 637, writ of error dismissed, was in trespass to try title with writ of possession in which the only question involved "was the location on the ground of the north boundary line—a common boundary line" between two surveys. The jury's verdict should have located, or furnished the means of locating, the disputed boundary on the ground so the officer charged with putting plaintiffs in possession could with the help of a competent surveyor have executed the writ of possession. (3) Hernandez v. Robeldo, Tex.Civ.App., 236 S.W. 2d 242, no writ history, was also in trespass to try title to a lot in Dallas, and for damages because of a building erected over the line. This Court said the suit was in fact a boundary suit and that judgment for the title and possession of a lot by lot and block number was insufficient, but the judgment should definitely fix and establish the location of the line in dispute with reference to some known object so an officer could execute the writ of possession. Appellants' authorities are not in point.

Neither the title nor the possession of any land is involved in this suit. It is not in any sense a boundary suit. The owners of the lots East of the common boundary are not parties. Mayflower having built residences upon and sold all lots adjoining appellee on the East. The judgment makes no attempt to fix the common boundary. No officer will have to locate the common boundary in executing the judgment. The judgment in this case is for money damages only.

The evidence shows without dispute that several trespasses occurred regardless of whether we accept appellants' contentions or appellee's contentions as to the exact location of the boundary line. The specific trespasses found by the jury (most of them were undisputed anyway) all occurred West of both of the asserted boundaries which would be most favorable to appellants. The exact location of the boundary line and of the ditch were evidentiary matters which could affect only the amount of the damages, not the well-established and even undisputed facts of trespasses and consequent damages.

Significantly, the record shows that appellants filed a cross-action in trespass to try title and secured the appointment of a surveyor to make a survey of the common boundary. But appellants abandoned that cross-action in a later pleading and effectively abandoned their right to have the common boundary specifically found and fixed. By reason of such abandonment the suit became merely one for damages.

■ Unquestionably appellants broke appellee's close. Their doing so constituted a trespass to realty. The court asked the jury whether Mayflower committed one or more trespasses as that term was properly defined and in addition submitted issues regarding the specific trespasses to appellee's realty, although most of these trespasses were undisputed. Those issues are sufficient.

Furthermore, if the jury had found the common boundary to be the one detailed in Requested Issue No. 1 (commencing on the North Line of Kit Lone Star Road 878.7 feet East of an old fence line along the West side of Ralston Street and thence North to appellee's Northeast corner), or the alternate one outlined in Requested Issue No. 2 (commencing at the same ;

point as No. 1, and proceeding Northerly along a wire fence from tree to tree) appellants would not have been entitled to judgment. The specific trespasses found by the jury, as we have already stated, all occurred West of both the boundaries, most favorable to appellants. Only the extent of the encroachment or penetration onto appellee's land would be affected by the exact location of the boundary. The extent of the encroachment was among the evidentiary matters considered and determined by the jury in finding the value of appellee's land after the construction of the ditch. Mayflower admitted or did not seriously dispute trespasses as follows: (1) the diversion of the waters of the old creek off the Northeast portion of appellee's land and the dumping of large quantities of dirt in the old creek bed there; (2) the building of a levee or dam, at least partly, on appellee's land on the West bank of the ditch; (3) the construction of a concrete apron partly on appellee's land at the South end of the ditch; (4) the obstruction of the natural outlet of the small creek or branch draining appellee's land at his Southeast corner. Therefore, whether the requested issues were answered favorably or adversely to appellants could "have no effect on the judgment" and could not "constitute an essential part * * * of an affirmative defense." Appellants requested no other issues

 Finally, appellee contends there is no basis for establishing his Southeast corner with reference to a hedge row, fence, Ralston Road or the Roberts Subdivision, as appellants' surveyors did, because none of these objects or marks are referred to in any deed in the chain of title of Mayflower or appellee, but both chains of title refer only to the Southwest corner of the Polly Montgomery Survey for their respective beginning points; thence both descriptions follow courses and distances only. Mayflower's surveyors, Brown and Ball, ignored the Southwest corner of the Montgomery Survey, stating their belief that it could not be located on the ground, but located appellee's Southeast corner with reference to a fence in an old hedge row along the West side of Ralston Street. This gave Mayflower about 18 feet more distance on its South line than its deed called for. Ironically, Mr. Brown in 1947 certified to a survey he had made for a former owner of appellee's land by which he placed the common boundary some 41 feet farther East of the one he located for Mayflower. Appellee's surveyor, Garrett, and the court appointed surveyor, McElyea, by using the Southwest corner of the Polly Montgomery Survey, as the deeds do, in locating appellee's Southeast and Mayflower's Southwest corners, show an encroachment by Mayflower on appellee of 41 feet per Garrett, or 19 feet per McElyea at appellee's Southeast corner—the discrepancy is caused by the fact that the Southwest corner of Montgomery's Survey is not monumented and is difficult to locate at least. While the location of lines or corners may not be established or controlled by objects not called for in the field notes, but must be established by calls in the field notes in the absence of conflicts or inconsistencies, it is obvious that competent surveyors differ here. No boundary as a matter or law was established. Gill v. Peterson, 126 Tex. 216, 86 S.W. 2d 629, 631; Thompson v. Langdon, 87 Tex. 254, 28 S.W. 931; 9 Tex.Jur.2d "Boundaries" § 6, pp. 475–476.

Appellants' first point of appeal is overruled.

### Causation and Damages.

Appellants group their points two through seven with one statement and argument. No authorities are cited thereunder because they say "we were dealing with rules and practices known to all."

Point two complains about the submission of issue No. 1A, inquiring whether appellants committed one or more trespasses on appellee's land, because (1) it involved a mixed question of law and fact; (2) the phrase "one or more" suggested at least one

trespass; (3) it was merely evidentiary; (4) was without guide to jury.

Point three complains about the submission of issue No. 1B, inquiring whether the trespasses resulted in damages to appellee's land, because (1) too general; (2) not limited to specific items of damages raised by the evidence; and (3) when considered with other issues, constituted multiple submission of general damages.

Point four complains of the submission to the jury awarding judgment on its answer of the general question of whether trespasses were committed that resulted in damage, without confining consideration to matters presented by the pleadings and evidence.

Point six complains of submitting to the jury and awarding judgment on its answer, the question of difference in value before and after the digging of the ditch without requiring findings that the difference was caused by trespass of the ditch on appellee's land or withdrawal of his lateral support.

Point seven complains that the findings (1) that the digging of the ditch was a trespass and (2) that it caused withdrawal of lateral support, are necessarily inconsistent and conflicting and cannot support a judgment based on a finding of value before and after the digging of the ditch.

Appellants' arguments largely reiterate those contained in the points themselves. In addition to what has already been said herein, the problem of lateral support deserves some comment.

■ Using appellants' most favorable survey a part of the ditch encroaches on appellee's land at the South end for about 40 feet and then at the most is only a few feet from the boundary line. Using the court appointed surveyor's survey beginning at the Southwest corner of the Polly Montgomery Survey, the ditch encroaches on appellee's land for about 300 feet per maps in evidence and then is nearer the line for the remainder of its length. Of course, appellee's surveyor Garrett puts all of the ditch on appellee's land or on the line. Appellants' engineer-surveyor testified that there is a recognized engineering principle that the banks of a ditch in soil such as here will seek a state of repose by cutting back, caving in and sloughing off a distance equal to the depth of the ditch. This principle was provided for in the design of the ditch by the gentle slope on the Mayflower East side, but on appellee's West side practically a vertical cut has already caved in and sloughed off back about 5 feet to the date of trial. At least seven oak trees a foot in diameter have been undermined and fallen into the ditch, some of which were even bearing marks of the wire fence appellants claim as the line most favorable to them. There is no conflict between findings of the various trespasses and the finding of loss of lateral support as that term was properly defined. The jury had to consider the extent of the loss of lateral support in fixing the value of appellee's land after the construction of the ditch.

It is undisputed that at least part of the ditch itself trespassed on appellee's land. It is also undisputed that several trespasses occurred in connection with the digging of the ditch, as we have heretofore pointed out. It is further undisputed that these trespasses resulted in damage to appellee. There is nothing in the record to suggest that any diminution in value might have been caused by anything other than trespasses and loss of lateral support.

We have fully considered each of said points in the light of the evidence and the instructions to the jury and are of the opinion that points two through seven should be overruled.

### Exemplary Damages.

Mayflower in its eighth, ninth and tenth points of appeal contends that there is no evidence justifying judgment for exemplary damages against it. We agree.

Mr. Lynn Brown, a licensed surveyor and engineer, whose competency is not questioned, was employed by Mayflower to design and locate the ditch in question. He did so. He established the line and set the grade for the contractor; he made a map and profile showing the lay out of the ditch before it was staked on the ground; the actual construction work was done by Austin Paving Company, an independent contractor, under Mr. Brown's supervision. There was no evidence indicating any malice, ill will, intent or wanton disregard for the rights of the appellee as an adjoining land owner in the location, design or construction of the ditch. On the contrary, evidence given by appellee himself negatives any malice and indicates that Mayflower, its officers, agents, employees and its independent contractor all were acting in the honest belief that they were doing what they had a legal right to do.

Of course, a corporation may become liable for exemplary damages, but this can arise only by imputation to it of the malice of some individual because the corporation is incapable of feeling and cannot be said to have acted with malice except by imputing to it the malice of some natural person related to it as agent acting for the corporation.

In a trespass upon land case, P. C. Sorenson Co. v. Bell, Tex.Civ.App., 326 S.W.2d 271, 273, writ ref. n. r. e., this court reversed and rendered a judgment for exemplary damage against a principal whose agents, engaged in building a sewer line ditch, crossed over adjoining land with heavy ditch-digging machinery (the act upon which exemplary damages was based) inflicting actual damages for which the employer was held liable. Chief Justice Dixon speaking for this Court after pointing out that the agents were not authorized to trespass on plaintiff's land, said:

"It is well established in this jurisdiction as a general rule that in order to render a principal liable in exemplary damages for the act of his agent the agent's act must have been previously authorized by the principal, or subsequently ratified or approved, or the principal must have been guilty of negligence in the employment of the agent." Citing authorities.

In a trespass upon land case which concerned an unauthorized construction of a pipe line across plaintiff's land, judgment against a corporation for exemplary damages was reversed and rendered in Upham Gas Co. v. Smith, Tex.Civ.App. Fort Worth, 247 S.W.2d 133, 135, no writ history, in which the court, while citing numerous authorities, outlined what we consider to be the correct principles in saying:

(1) "Where the injury complained of is connected with real property, exemplary damages will not be given in the absence of the existence of the essential circumstances of aggravation. * * *

(2) "To authorize a finding of exemplary damages for trespass, the evidence must show some element of fraud, malice or oppression. The act which constitutes the cause of action must be actuated by or accompanied with some evil intent, or must be the result of such gross negligence or such disregard of another's right as is deemed equivalent to such intent. * * *

(3) "To sustain a judgment for exemplary damages, it is not sufficient to show that the defendant could or should have foreseen and prevented the loss or injury—but that defendant acted intentionally or wilfully or with a degree of gross negligence, which indicates a fixed purpose by defendant to bring about the injury of which plaintiff complains. * * *

(4) "Punitive damages may not be awarded where it appears that the defendant acted in good faith or without wrongful intention, or in the belief that he was exercising his rights. * * *"

There is no evidence that Mayflower or its officers gave Mr. Brown any directions

as to exactly where the ditch was to be located, or as to its design and size. Mayflower relied on him in his professional capacity to do the necessary survey work for proper location of the ditch and to determine its size and design and to give plans and directions to the independent contractor who did the actual construction work. Nothing indicates that Mr. Brown knowingly located the ditch so as to encroach on appellee's land, or that he had any evil or malicious intent toward appellee in doing what he did. Certainly the trespasses complained about were never previously authorized nor subsequently ratified or approved by Mayflower.

Appellee testified that when he first noticed that Mayflower was doing some work on its land and before the work of digging the ditch commenced, he went to its field house and met the Vice-President of Mayflower and asked him "if they knew what they were doing, if they were on their land, and they indicated to me they were sure that they were at the time". Appellee said that Vice-President Brady was very gracious to him, and said they wanted to get along with their neighbors, and if "at any time I had any kind of complaint of any kind, to come and see him". Appellee further testified that he himself did not know where the common boundary line was, and never learned its location until he had a survey made after this suit was filed. Furthermore, appellee never contacted Mayflower, or any of its officers or agents with any kind of complaint about the work being done until after all work on the ditch was completed, when he went again to see Vice-President Brady, and pointed out that the rains had caused some erosion of the levee they had built on the West bank and that he was fearful it would not hold. No reference even then was made to encroachments over appellee's boundary. Again appellee said he found Mr. Brady very gracious in his attitude and that Mr. Brady said he would come out and see about it; that he did come out and admitted that they had damaged appellee and invited him to name the amount

of the damages. Unfortunately, the parties were unable to reach an agreement.

■ There is no evidence in this case of any element of fraudulent, oppressive, malicious or wanton conduct on the part of any agent of Mayflower. Furthermore, there is no evidence that Mayflower had knowledge of, or participated in any malice or wantonness or ratified and adopted the acts of any person which constituted or might have constituted the alleged malice. It is clear from the evidence that appellants acted in good faith, without any wrongful intention and in the bona fide belief that they were exercising their rights. Therefore, appellants' points 8, 9 and 10 are sustained.

### Individual Defendants.

In their points 11 through 20, the individual appellants complain that there was no evidence to raise the issues submitted relating to President Collins and Vice-President Brady, that the issues were immaterial as a basis for judgment, and that no judgment should have been rendered against them, or either of them, for actual damages. We agree, and sustain their points of appeal.

Appellee's allegations against these individuals was that "they personally participated in the commission of the acts of the corporation-defendant, in that they were personally upon the premises here involved at various times during the construction of the drainage ditch and knew that it was being constructed, approved its location, as well as its course and size", and that "said defendants also directed, knew, approved and cooperated in all of the acts of said corporate-defendant". Based on the personal activities of the individual defendants, appellee concludes that they were jointly and severally liable to him for damages he sustained.

It was shown that these officers were on and upon the scene of operations in the sub-

division and development of Mayflower's land for residental purposes, and generally knew what was going on. However, no proof was offered that either of them had any knowledge as to where the common boundary line was, or that either of them gave any directions to Mr. Brown, the engineer, or the independent contractor who actually did the work. The fact they knew that the ditch was to be dug at or near the location where it was situated, and consented to the location and approved the size of the ditch imposes no liability upon the individuals. A qualified engineer was employed to properly locate and properly design the ditch, and an independent contractor engaged to construct same. Neither the President nor Vice-President personally had any part in the tortious acts that give rise to liability against Mayflower.

There is no evidence that either of the individual officers knew, and certainly no reason why they "should have known", what effect, if any, the excavation for the ditch would have upon the appellee's land. This is not a negligence case and judgment cannot rest upon mere breach of duty to know as distinguished from knowledge. Therefore, we may ignore the phrase "should have known".

Of course, an officer or any other agent of a corporation may be personally as responsible as the corporation itself for tortious acts when participating in the wrongdoing. An officer of a corporation is always primarily liable for his own torts, even though the principal is also liable therefore, but he cannot be held liable for a wrong in which he has not participated. 14 Tex.Jur.2d p. 474, "Corporations" § 372; 2 Tex.Jur.2d p. 612, "Agency" § 167. "An agent is personally liable to third persons for his own misfeasance and positive wrong, but is not generally liable to them for his nonfeasance or omission of duty in course of his employment." Seismic Explorations v. Dobray, Tex.Civ.App., 169 S.W.2d 739, err. ref. w. o. m.

Interest.

Appellants' 21st point complains of the error of the court in adding interest in the judgment to the actual damages as found by the jury, in the absence of any evidence to support a finding as to the date from which the interest would be computed. This point of appeal is not well taken.

Appellants recognize the rule that allows interest as a part of the damages where property of a determined value is damaged, destroyed or taken on a determined date. They contend however, that the rule cannot apply here, because under the pleadings, the evidence and the court's charge the date of destruction, damage, or taking was not and could not be fixed.

Appellee testified that the ditch was completed in the spring of 1952. Mr. Lee Brady, Vice-President of Mayflower, testified "I am going to assume that ditch was rightly completed in the middle of 1952". This is testimony produced by appellants and is, therefore, binding on them. The jury found the value of the appellee's property immediately before the construction of the ditch to be $25,000 and its value after the construction of the ditch at $15,000. Interest computed from July 1, 1952 was awarded in the judgment. The interest as part of the damages was properly computed. State v. Hale, 136 Tex. 29, 146 S.W.2d 731. (Syl. 22). Appellants' point 21 is overruled.

The judgment of the trial court allowing the sum of $14,350 as actual damages with interest accrued to date of judgment is affirmed, but the judgment for an additional sum of $12,750 is reversed and judgment is here rendered denying any recovery of exemplary damages, all as against Mayflower Investment Company. The judgment against the individual defendants Collins and Brady is reversed and here rendered denying any recovery against either of them.

Costs will be taxed one-half against Mayflower Investment Company and one-half against appellee Stephens.

Affirmed in part and reversed and rendered in part.

## On Rehearing.

DIXON, Chief Justice.

Both appellant Mayflower Investment Company and appellee Russell S. Stephens have filed motions for rehearing.

### Appellant's Motion.

In appellant's motion its first point is that we erred in holding that appellant's action in amending its answer constituted an abandonment of its right to have a common boundary specifically determined.

Appellant's original answer is not copied into the record. But it evidently included a cross-action in trespass to try title, for it was upon appellant's request that the trial court appointed a surveyor pursuant to Rule 796, Texas Rules of Civil Procedure. The Rule is applicable only in trespass to try title cases. That appellant's original answer included a count in trespass to try title is also asserted by appellee in his brief, and the assertion is not challenged by appellants.

Though appellants in their amended answer did make allegations in regard to the boundary line, they omitted their cross-action in trespass to try title. The suit thus became simply a suit for damages for trespass. And under the circumstances it was not necessary to determine the boundary line, for as Justice Thomas points out in our original opinion, the undisputed evidence showed that there were trespasses on appellee's land even if we accept appellants' contention as to the location of the boundary line.

That this was simply a suit for damages and not a trespass to try title or a boundary suit, is further indicated by the fact that the present owners of the lots abutting appellee's property to the east were not made parties. Since the trespasses were committed appellants have divided the property into lots and blocks and have sold the lots to various purchasers who have built houses on their lots. If appellants or appellee were suing in trespass to try title, or to settle a boundary suit these various present owners of abutting lots, would in all reason, have to be made parties to the action. But no one has objected to their absence as parties.

In its fifth point on rehearing appellant Mayflower says that it was error to submit special issue No. 1A inquiring as to whether appellants committed one or more trespasses on appellee's land, because (1) it involved a mixed question of law and fact; (2) the phrase "one or more" suggested to the jury that there was at least one trespass on appellee's land; (3) it was a mere evidentiary issue and was not given or used in connection with any claim of actual damages sustained; and (4) it was without any guide to the jury whereby it could determine from facts in evidence whether there was in fact a trespass.

We see no merit in appellant's fifth point on rehearing. As to appellant's contention numbered (2): the undisputed evidence shows that there was not only one, but there were several trespasses committed by Mayflower. As to appellant's contentions numbered (1), (3) and (4): if for the sake of argument we were to accept said contentions as correct we would have to hold that the submission of the issue was harmless error, since it was an immaterial superfluous special issue which neither helped nor hindered the jury in the discharge of its duties.

Appellant Mayflower's other points on rehearing have been considered and are overruled.

## Appellee's Motion.

In his first point on rehearing appellee says that we erred in holding there was "no evidence" to justify the trial court's judgment for exemplary damage against Mayflower because there (a) was evidence which required the submission of the issues relating to exemplary damages, (b) the evidence was not against the great weight and preponderance of the evidence and hence was not insufficient to support the verdict of the jury, (c) Mayflower's points on appeal did not raise or present the question of "no evidence" on appeal, and (d) Mayflower's points insofar as they relate to the evidence question complain only of the "insufficiency" of the evidence and the Court of Civil Appeals was not authorized to consider a point of "no evidence" because the same was not raised by appellant on appeal.

Appellee's first point on rehearing refers to appellants' tenth point on appeal in their original brief in which point appellant, Mayflower, asserts that the trial court erred in submitting special issues Nos. 11A, 11B and 11C pertaining to exemplary damages "because the evidence was wholly *insufficient* to raise any issue of evil intent, or the equivalent of evil intent, on the part of Mayflower Investment Company in doing the things inquired about in other issues submitted to the jury." (Emphasis ours.)

The question then is: In sustaining appellants' tenth point were we authorized to hold that there was "no evidence" to support submission of special issues Nos. 11A, 11B and 11C?

The terms "no evidence" and "insufficient evidence" have been the subject of much discussion in judicial opinions and law review articles. The latest expression on the subject to come to our attention is contained in an article by Chief Justice Robert W. Calvert of our Supreme Court in Texas Law Review Vol. 38, No. 4, for April 1960. We quote from that article:

"It was thought that the per curiam opinion of the Supreme Court in In re King's Estate [150 Tex. 662, 244 S.W.2d 660] and the publication of former Associate Justice Garwood's excellent article, The Question of Insufficient Evidence on Appeal, would resolve, both for lawyers and judges of Courts of Civil Appeals, most of the problems growing out of points of error challenging a verdict or judgment because of a lack of evidence or lack of sufficient evidence to support it, or because it is contrary to the great weight and preponderance of the evidence, but a growing number of recent decisions indicate a continuing misunderstanding in some quarters of the nature and office of points of error of that type, justifying, it seems to the writer, a somewhat more analytical discussion of the subject. * * *

"Under the injunction of Rule 1 that the Rules of Civil Procedure be given a liberal interpretation 'to obtain a just, fair, equitable and impartial adjudication of the rights of litigants,' magic in words in points of error should be as extinct as the dodo bird. In his article Justice Garwood referred to two types of points, i.e., 'no evidence' points and 'insufficient evidence' points. Expressions in points of error such as 'no evidence,' 'insufficient evidence,' 'no sufficient evidence,' 'no legally sufficient evidence,' 'against the great weight of the evidence,' 'contrary to the preponderance of the evidence,' ad infinitum have definite connotations in the mind of an appellate judge, but, except in a very limited way, they are not, or at least should not be, controlling. The controlling consideration with an appellate court in passing on a point of error directed at the state of the evidence is not whether the point uses the preferable, or even the proper, terminology, but is whether the point is based upon and related to a particular procedural step in the trial and appellate process and is a proper predicate for the relief sought. * * *.

"No Evidence Points

"1. Procedural Basis for Points.

" 'No evidence' points of error are inherently and fundamentally points which call for reversal of a trial court's judgment and rendition of judgment for the appellant. They must, therefore, be based upon and related to one or more of the following procedural steps in the trial Court: (a) motion for instructed verdict; (b) objection to the submission to the jury of a vital fact issue; (c) motion for judgment notwithstanding the jury's verdict; (d) motion to disregard the jury's answer to a vital fact issue. All are steps which must be taken before the rendition of judgment.

"If a point is based upon or related to one or more of those steps it is a 'no evidence' point, and the fact that the point may speak of 'insufficient evidence' or 'no sufficient evidence' cannot make it otherwise. In whatever language the point may be couched, its essence is that there is an absence of proof of a vital fact, and that the trial court erred in not rendering judgment for the appellant. On the other hand, a point of error not based upon or related to one or more of the enumerated procedural steps simply cannot be a 'no evidence' point, irrespective of how it is worded."

█ It is only when there is no evidence to raise an issue about a vital fact that the court may refuse to submit a special issue inquiring about it. If there is some evidence raising the issue of fact it is the duty of the court to submit a special issue about it, though later it may become the duty of the court to set aside the jury's answer on the ground that the answer is so contrary to the overwhelming weight and preponderance of the evidence as to be obviously unjust. Therefore, there would be no point in objecting to the submission of an issue on the latter ground.

█ Applying the test laid down by Chief Justice Calvert we must hold that since appellant's point is directed at the sub-

mission to the jury of a vital fact issue, it is a "no evidence" point, and the fact that the point asserts that the evidence was wholly "insufficient" cannot make it otherwise. In other words, when appellant attacked the submission of the three special issues on exemplary damages the essence of its point was that there was no evidence to support the submission of the issues notwithstanding the way it worded its point. That being so it was not error to apply the "no evidence" rule in passing on the point.

Appellee insists that there is evidence in the record to support the jury's findings of exemplary damages against Mayflower Investment Company. Two of the corporation officials, Carr P. Collins, President, and Lee Brady, Vice-President, were on the scene nearly every day during the construction of the ditch in controversy. Certainly they saw it being dug. But we find no testimony to support a finding that they knew, and through them the corporation knew, that their operations trespassed on appellee's land. And in the absence of some testimony that the two officers or the corporation either knew and authorized the trespasses, or ratified them, or showed a reckless disregard of whether or not they trespassed on appellee's land, the corporation cannot be held liable for exemplary damages.

Appellee calls our attention that the costs in the trial court in this case amount to $389.65. This includes an item of $310 for the fee paid to the surveyor appointed by the court over appellant's objection, pursuant to Rule 796, T.R.C.P. at a time when appellants had on file a cross-action in trespass to try title. Later appellants amended their pleadings and eliminated their cross-action in trespass to try title.

█ We agree that appellee ought not to be required to pay one-half of the trial court's expenses. The costs will therefore be retaxed as follows: all costs incurred in the trial of the case in the District Court will be taxed against appellants; costs in-

curred in connection with the appeal will be taxed one-half against appellants and one-half against appellee.

All of appellee's points on rehearing have received our consideration.

Appellant's motion for rehearing is overruled. With the exception of the retaxing of costs as above stated, appellee's motion for rehearing is overruled.

WILLIAMS, J., not sitting.