John **BELL**, Jr., et ux., Appellants,

v.

Joe **CURRIE** et al., Appellees.

No. 7614.

Court of Civil Appeals of Texas.

Amarillo.

May 30, 1966.

Carnahan & Fields, Amarillo, O. P. Fields, Jr., Amarillo, of counsel, for appellants.

Lair, Williams & Cox, Canyon, A. W. Lair, Canyon, of counsel, for appellees.

CHAPMAN, Justice.

This is an appeal from an instructed verdict in a suit filed by appellant John Bell, Jr., and wife to recover from appellees, Joe Currie, Golden Currie and H. J. Price d/b/a Currie Drilling Company, the amount of money paid appellees for drilling a domestic water well appellants allege appellees by oral contract were obligated to drill in a workman-like manner and which was not so drilled.

The jury having been instructed to find for appellees at the close of appellants' testimony, we must view the evidence in the light most favorable to the losing party,

indulging against the instruction every inference that may properly be drawn from the evidence. Dunagan v. Bushey, 152 Tex. 630, 263 S.W.2d 148; McCarty v. Moss, Tex.Civ.App., 225 S.W.2d 883 (error ref.); Houston Transit Co. v. McQuade, Tex.Civ. App., 223 S.W.2d 64 (error ref.); Speights v. Deon, Tex.Civ.App., 182 S.W.2d 1016 (error ref.); James v. Missouri-Kansas-Texas R. Co. of Texas, Tex.Civ.App., 182 S.W.2d 921 (error ref.).

Appellants testified that the only agreement they first had with appellees was to drill the well three hundred feet at the price of $1.50 per foot for drilling, " * * * and we wanted good water." When no water was found at three hundred feet to justify production appellees agreed to drill deeper at the same price. So far as we can tell from the record that is the only agreement between the parties concerning the drilling of the well proper, though there were agreements with respect to the casing, pump, etc. There is no showing in the record as to a meeting of the minds between appellants and appellees that the latter contracted to drill a well that would furnish "good water," whatever that term means. Additionally, one of appellants' witnesses, Mr. McCaskell, who finally drilled a satisfactory well for appellants and who testified he had drilled between three and four thousand water wells, testified that he never, in any experience as a well driller attempted to guarantee that the water would have a certain taste one way or another. We make this statement only because of the considerable amount of evidence to the effect that the wells rejected produced water with a salty, soda taste. Actually, Appellant Bell testified concerning the well appellees drilled, that he had no agreement with them that if he was not satisfied with one strata of water they were to seal it off and go to another strata; had no complaint of the quantity of the water; but his only complaint was " * * * dirty water and the filth it would pump out." Yet, he testified he never had any agreement about

sealing off any strata of water to keep it from running down the outside of the casing.

The explanation given by appellants' witness, Campbell, for the murky, dirty condition of the water was that " * * * the only thing I could figure, top water was running down the side of the hole through the red bed and washing clay and dirt down as it went." However, this witness testified his experience in drilling water wells had been in the Hereford area and that he knew nothing of the formations where the subject well was drilled. Mr. McCaskell testified that in his opinion " * * * there is not enough top water out there to indicate it would come down." Mr. McCaskell also testified:

"Q. You heard the process described here that the Curries used in connection with the drilling of this well—have you heard anything described that indicated an unworkman-like way of drilling a well?

"A. No, sir, I have not.

\* \* \* \* \* \*

"Q. And if there was top water there in that well that Mr. Currie drilled, there was a better way of sealing it off than what he used, wasn't there?

"A. No, sir, I wouldn't say that. * *"

The witness did not seal his well in the manner the Curries used but the testimony shows that he received $2.00 per foot for drilling. Appellants' witness, Campbell, also testified that if appellants paid $1.50 per foot for the drilling of the first well he could not have paid for a "graveled well," the term that seemed to have been used in the case for sealing off top stratas of water. He testified a "graveled well" would be $1.75 to $2.00 per foot. Mr. McCaskell testified he drilled his second well free of cost because the Bells were dissatisfied with the first well he drilled and the water was not suitable for domestic use.

The only testimony we have found in the record with respect to a "graveled" job on the Currie well is the conversation related by appellant between himself and H. J. Price as follows:

"Q. And did you have a conversation at that time with Mr. H. J. Price?

"A. Yes, I did.

"Q. All right—relate that, please.

"A. Well, I went in to Mr. Price and we exchanged greetings, and I said, 'did you get a good well out there?' and he said yes. I said, 'is the gravel packed, did you get a good gravel job?' and he says, 'yeah,' and he says, 'didn't really have to, the gravel packed itself.' I says, 'the gravel packed itself?' He said yes; * * *"

■ This testimony taken in connection with Mr. Bell's previous testimony to the effect that the only agreement he had was that the well would be drilled for $1.50 per foot furnishes at least no more than a scintilla of evidence that appellees were obligated at that price to do a "graveled well." This is particularly true in connection with the other testimony placed in the record by appellants to the effect that they could not have paid for a "graveled well" at the price of $1.50 per foot. Of course, it is elementary that the parties could have contracted for such a well at that price or any other price, but there is just no probative evidence they did so. In fact, it is difficult to conceive of a contract to perform as important a service as the production of a domestic water well for one's home, requiring as much expenditure, under an arrangement as casual and with as few specifics as this case shows. The mere statement by Mr. Bell " * * * and we wanted good water" did not, in our opinion, obligate appellees to produce what Mr. Bell termed "good water" when there is no showing in the record of a meeting of the minds in that connection.

Appellants presented all the witnesses that were used. None were called as adverse witnesses.

■ The party who places testimony in evidence vouches for their credibility and is bound by their testimony. Pickett v. Dallas Trust & Savings Bank, Tex.Com. App., 24 S.W.2d 354; Whitefield v. Whitefield, Tex.Civ.App., 160 S.W.2d 306 (writ ref. w. m.); Mayflower Investment Company v. Stephens, Tex.Civ.App., 345 S.W. 2d 786 (N.R.E.).

■ It has been held that one may contradict the testimony of his own witness by independent facts showing its falsity or inaccuracy, Whitefield v. Whitefield, supra, and Travelers Ins. Co. v. Blazier, Tex.Civ. App., 228 S.W.2d 217 (writ dism.), but this record nowhere shows the falsity or inaccuracy of the testimony to the effect that appellant could not have contracted for a "graveled well" at $1.50 per foot, and the only testimony even tending to show lack of proper workmanship is the failure to seal off the top strata in such manner. As heretofore stated, appellants' own witness, Mr. McCaskell, stated there was not anything said in the courtroom that showed an unworkman-like manner on the part of appellees in drilling the well.

We do not consider Westbrook v. Watts, Tex.Civ.App., 268 S.W.2d 694 (N.R.E.), cited by appellants, as any authority for their contention in this case. There the parties were operating under a written contract that spelled out the obligations of each. Here appellants are in effect seeking to recover on the failure of appellees to do a "graveled well" which their own testimony shows they were not obligated to do at the price agreed upon for the drilling.

■ Appellants' second point simply states that the court erred in sustaining defendants' motion for instructed verdict for the defendants, and no more constitutes a point than a similar statement to the effect that the trial court erred in sustaining

a motion for summary judgment, which has been held to be too general to constitute a point. White v. Great American Reserve Insurance Co., Tex.Civ.App., 342 S.W.2d 793 (N.W.H.). However, by looking to the statement and argument under the point, we are able to determine the complaint being made, and will give it our consideration.

If we understand appellants' argument under their second point, it is to the effect that the motion for instructed verdict was not in writing and did not state the specific grounds upon which it was made.

Rule 268, Vernon's Ann. Texas Rules of Civil Procedure, provides: "A motion for directed verdict shall state the specific grounds therefor." The rule does not state it shall be in writing.

When the trial court announced it considered the testimony insufficient to go to the jury, counsel for appellants only stated: "The Plaintiffs except." It does not appear in the record that exception was made for the reason that the motion did not state the specific grounds therefor.

 Even if it should be said, arguendo only, that sufficient grounds were not stated, it does not follow that the granting of a judgment thereon constituted reversible error. In Harvey v. Elder, Tex. Civ.App., 191 S.W.2d 686 (writ ref.) the San Antonio intermediate appellate court held:

"When questions of law only are involved, a trial court may at the conclusion of the hearing of the evidence take the case from the jury and proceed to render judgment. This may be done on the court's own motion and this power is in no way dependent upon a motion having been filed by a party litigant. Rudco Oil and Gas Co. v. Gulf Oil Corporation, Tex.Civ.App., 169 S.W. 2d 791. We see no difference between the situation where the court on its own motion renders a judgment and one where the court upon an irregular or insufficient

motion by one of the parties directs a verdict and renders judgment accordingly. In either instance, in determining the matter of reversible error, the question is the same, i. e., Was the prevailing party below entitled to judgment as a matter of law?"

Having held that the prevailing parties below were entitled to judgment as a matter of law, it follows that no error is shown in appellants' second point. Informality in presenting such a motion and generality in specifying grounds therefor are matters which the complaining party may waive if he does not object thereto seasonably. Routte v. Guarino, Tex.Civ.App., 216 S.W. 2d 607 (N.R.E.).

Accordingly, the judgment of the trial court is affirmed.